**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 5:26-CR-00002-SCM-MAS-1 |
| ) | |
| **DESTINY GRACE BURNS,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION & ORDER**

Destiny Grace Burns ("Burns") came before the undersigned for an initial appearance on January 23, 2026. [DE 14]. The United States moved to detain Burns, and the Court conducted a detention hearing. Considering the record—including testimony, proffer, the Pretrial Services Report ("PSR") and addendum ("PSR Addendum"), and arguments—the Court finds that Burns must be detained in accordance with the Bail Reform Act ("BRA") and shall grant the United States' motion for detention.

**I.    ANALYSIS**

Burns is charged with three counts of knowingly and intentionally distributing 50 grams or more of methamphetamine (actual), one count of possessing, with the intent to distribute, 50 grams or more of methamphetamine (actual), and conspiracy of the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846. [DE 1]. At the initial

appearance, the United States orally moved for pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(B) and (C). [DE 14]. The Court conducted a detention hearing on January 29, 2026. [DE 24].

A.     **LEGAL STANDARD FOR DETENTION UNDER THE BAIL REFORM ACT**

The Court afforded both sides all procedural rights outlined in the Bail Reform Act. Given the nature of the charges, a detention presumption arises under the BRA as to both the nonappearance and danger risks. 18 U.S.C. § 3142(e)(3)(A). The presumption imposes upon the defendant a "burden of production" to introduce "at least some evidence" that he is neither at risk of nonappearance nor endangering the community. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). This burden "is not heavy," and the Government retains the ultimate burden of persuasion. *Id.* An unrebutted presumption requires detention. Even if the defendant fails to rebut the presumption, the presumption remains a factor in determining detention. *Id.* ("The presumption remains as a factor because it . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

If a defendant rebuts the presumption of detention, the burden shifts back to the United States to prove that detention is nevertheless warranted. Detention premised on nonappearance must rest on facts supported by a preponderance of the evidence. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. July 18, 2006). Detention based on danger, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure the safety of the

community. 18 U.S.C. § 3142(f). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with any imposed conditions. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as a critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). However, the nature and quality of proof impacts its probative value and weight in the detention calculus. The § 3142(g) factors guide the analysis.

### B. BURNS REBUTTED THE PRESUMPTION

To rebut the presumption as to nonappearance and danger, Burns relied mainly on the PSR and testimony of her mother, Leslie Burns. Burns has a relatively *de minimis* criminal history, which is not comprised of any previous violent or trafficking history. And Burns's mother testified that, if released, Burns would be able to live with her with appropriate conditions. Burns also indicated that she would be willing to participate in an in-patient or out-patient treatment program for substance use disorder. On balance, the Court finds that these considerations are sufficient to meet Burns's low production burden and overcome the detention presumption as to danger and nonappearance. *See Stone*, 608 F.3d at 945; *see also*

*United States v. Hernandez*, No. 1:02-CR-006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002) (requiring "probative, credible evidence to rebut the presumption").

However, "[t]he presumption in favor of detention does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class.'" *United States v. Lattner*, 23 F. App'x 363, 364 (6th Cir. 2001) (citing *United States v. Martir*, F.2d 1141, 1144 (2d Cir. 1986)). Thus, the presumption must remain a pro-detention consideration in both the nonappearance and danger contexts. *Stone*, 608 F.3d at 945.

### C.  BURNS'S DANGER TO THE COMMUNITY

In analyzing Burns's potential for danger to the community, the Court considers her history and characteristics, the nature and circumstances of the offense charged, the weight of the evidence against Burns, and the nature and seriousness of the danger to any person or the community that would be posed by her release. *See* 18 U.S.C. § 3142(g). Although she overcame the initial presumption, in evaluating the BRA factors in combination, the Court finds that the United States has nonetheless shown by clear and convincing evidence that the proposed conditions would not adequately assure community safety in this case.

#### 1.  **Burns's History and Characteristics**

The Court must consider many aspects of Burns's background in making the decision to release or detain her. Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of

residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

As it stands, Burns has lived a relatively tumultuous life. At the age of two, she was removed from the residence of her biological parents due to neglect and was placed in the care of her grandfather in Lincoln County, Kentucky. [PSR at 2]. During her bond interview, Burns indicated that she suffered sexual abuse by both her grandfather and uncle, which resulted in her eventual removal from the home and entry into the foster care system at age eight. At ten, Burns was placed at the home of Chans and Leslie Burns in Berea, Kentucky, who formally adopted her at age thirteen. She has a strong relationship with her adoptive parents, both of whom attended the detention hearing in her support. Burns reports that she has one biological brother, with whom she no longer has contact. She also reports having three adoptive siblings: two older sisters, twenty-five and twenty-three, and a younger brother, fifteen. Additionally, Burns indicated that she believes she may be pregnant with her boyfriend and co-defendant Aaron Whittamore's ("Whittamore") child. Prior to her arrest, Burns was residing with Whittamore at an apartment on Kristen Drive in Richmond, Kentucky; however, if released, Burns will live with her adoptive parents.

Burns is twenty-three years old. [PSR at 2]. She graduated from Madison Southern High School in 2020 and moved to attend Morehead State University.

Burns stated that she ultimately received an associate's degree in physical science; however, her mother indicated that Burns did not complete her educational pursuits. [PSR at 2; PSR Addendum at 2]. Burns's history of employment is scattered between several different companies and fields. While currently unemployed, Burns was scheduled to begin work at Dunkin Donuts on February 2, 2026, before her arrest. It is unknown if that employment opportunity is still available if she is released.

Burns reported that she is in relatively good health at present. [PSR at 3]. She suffers from frequent kidney infections and seizures, and has a lump on her breast, which she has not yet received medical attention for despite it being present for one year. Additionally, she reported prior diagnoses for post-traumatic stress disorder, obsessive compulsive disorder, attention deficit hyperactivity disorder/attention deficit disorder, reactive attachment disorder, bipolar disorder, and multi-personality disorder.[1] Burns has a history of suicidal ideation and self-harm behavior which have resulted in in-patient treatment at The Ridge on several occasions; however, she has not had any recent episodes of such behavior. She has received extensive therapy and was previously prescribed several mental health related medications. At the age of eighteen, she ceased all treatment and medication. Finally, Burns reported substance abuse disorder beginning at age twenty, when she began using methamphetamine. She reported last using methamphetamine one week

---

[1] Leslie Burns indicated that the formal diagnosis was Cluster B personality disorder, due to Burns's juvenile brain not being fully developed. [PSR Addendum at 2].

prior to the pretrial service interview. Leslie Burns indicated that Burns also has a history of the use of fentanyl, heroin, cocaine, and Xanax. [PSR Addendum at 2].

On balance, Burns's criminal history is not extraordinarily concerning. Perhaps most importantly, Burns has never been arrested for any drug-related offenses. Beyond basic traffic offenses, Burns has a 2022 conviction for Receiving Stolen Property-$500 or Greater but Less Than $1,000 and Theft by Deception. [PSR at 4]. The PSR indicates that an individual named Benjamin Johnson, who was possibly Burns's boyfriend at the time, stole jewelry from a residence in Fayette County. After being pawned by Burns, the jewelry was located at The Castle Jewelry and Pawn in Richmond. Several months later, Burns was charged with Receiving Stolen Property-$10,000 or Greater. Although the context is not fully known, the charge was later amended upon conviction to Receiving Stolen Property-$500 or Greater but Less Than $1,000. Leslie Burns indicates that this matter was related to Burns and her boyfriend at the time stealing a camper. [PSR Addendum at 2]. She also reported that the two attempted to flee from police, leading to police pursuit. The available records indicate that Burns was released on bond in both cases and appeared at all relevant court dates.

In considering Burns's criminal history, it is necessary to consider Burns's behavior after being released on bond in the related state case. Burns posted bond on August 25, 2025, and was ordered not to use alcohol or drugs, and to have no new arrests or violations of law. [PSR at 5]. The PSR, however, indicates that Burns has continued using methamphetamine, in violation of her state bond. Furthermore,

testimony indicates that Burns also continued trafficking controlled substances immediately following her release on bond.[2]

All in all, although there are certainly negative considerations—history of substance abuse disorder, mental health issues, continued drug use and trafficking while on bond—under this factor, these are largely outweighed by the positive considerations—strong family and community ties, possible employment upon release, and a relatively minimal criminal history, particularly the lack of drug trafficking history. Thus, this factor, albeit close, favors release.

### 2. The Nature and Circumstances of the Offense Charged

The next BRA factor is the "nature and circumstances of the offense charged, including whether the offense . . . involves a . . . controlled substance, [or] firearm[.]" 18 U.S.C. § 3142(g)(1). The allegations here are serious. And the BRA manifestly signals Congress's belief in the inherent, exceptional dangerousness of the at-issue offense. Indeed, as previously discussed, the detention presumption stemming from it "does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class [of crimes].'" *United States v. Lattner*, 23 F. App'x 363, 364 (6th Cir. 2001) (quoting *United States v. Martir*, F.2d 1141, 1144 (2d Cir. 1986)). At the detention hearing, the United States offered proffer and proof of Burns's alleged criminal conduct, mostly through the testimony of Task Force Officer Scott McIntosh ("McIntosh") of the Drug Enforcement Agency.

---

[2] The details of this trafficking will be further explored in a later section of this opinion.

According to McIntosh, agents conducted extensive investigation of Burns before her arrest. On June 9, 2025, a confidential informant ("CI") purchased 28.2 grams of methamphetamine from Burns at the Kristen Drive apartment. On July 9, 2025, the same CI purchased 56.1 grams of methamphetamine from Burns at a Best Western Hotel in Richmond, Kentucky. On July 24, 2025, the transaction returned to the Kristen Drive apartment where the CI purchased 56.08 grams of methamphetamine. Based on observation, Whittamore was only present for the July 24, 2025, transaction, and did not appear to take any sort of role in conducting it.

Nearly a month later, agents received intelligence indicating that Burns was likely planning to replenish her methamphetamine supply at a McDonald's in Madison County. On August 22, 2025, officers tracked Burns's vehicle to McDonald's and observed that it was empty. Eventually, an unknown vehicle parked behind Burns's. Whittamore exited the vehicle carrying a duffel bag and got in the passenger side of Burns's vehicle, while Burns exited the back and entered the driver's seat of hers. Officers then followed Burns's vehicle before conducting a traffic stop and search, which revealed that the duffel bag held three gallon-size plastic bags containing a clear substance, suspected to methamphetamine. The lab later determined that this was, in fact, over two kilograms of pure methamphetamine.

Both the nature of the offense—a presumption drug trafficking case—and the circumstances surrounding it—an extensive drug trafficking operation—heavily favor Burns's detention. Drug trafficking is, in and of itself, an offense that poses a serious danger to the community. *United States v. Stone*, 608 F.3d 939, 955 n.6 (6th

Cir. 2010). And the information provided by the government clearly indicates that Burns likely took the lead in the trafficking operations. This notion is exacerbated by the fact that her co-defendant was not present for at least three of the transactions, including the post-arrest transaction discussed below. Furthermore, the conduct underlying the Indictment indicates a very high volume of drugs trafficked throughout an extensive period. This certainly indicates a high-level operation. Thus, the presumption persists as a pro-detention consideration and, overall, this factor must favor detention.

### 3. The Weight of the Evidence of Dangerousness

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence. 18 U.S.C. § 3142(g). "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *Stone*, 608 F.3d at 948).

This factor is somewhat duplicative of § 3142(g)(1) and (3) because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior. As previously noted, Burns is facing five serious charges relating to the distribution of substantial quantities of methamphetamine on four separate occasions. [DE 1]. Furthermore, the evidence discovered during the traffic stop included drugs and cash in such a large quantity that it must suggest a trafficking operation, with Burns at the helm.

Notably, the United States proffers that, following her arrest and subsequent release, Burns continued trafficking drugs in order to obtain the funds required for Whittamore's release.  According to McIntosh, there were several jail calls between Whittamore and Burns that indicated that Burns was planning to continue trafficking drugs to obtain the funds, including one where Burns showed Whittamore an envelope of money.  During another call on August 30 or 31, Burns indicated that an individual named "Mrs. C," also known as Connie Mullins, would be coming to the Kristen Drive apartment.

Sometime around August 30, 2025, officers observed Mullins arrive at the Kristen Drive apartment and enter.  After some time, Mullins left and entered a taxi.  The taxi was subsequently stopped and searched.  The search produced a significant amount of methamphetamines, far more than necessary for personal use.  McIntosh estimated that it was around $1,500 to $2,000 worth of drugs.  Mullins then explained to officers that she purchased the methamphetamine from Burns and was planning to distribute it.  Additionally, she indicated that the transaction was related to Burns's intent to gather money for Whittamore's release.  Later, officers observed Burns meeting with Wilma Robinson, Whittamore's mother.  Robinson then traveled to the jail and presented the $10,000 bond in an envelope eerily similar to the one recently produced by Burns on a jail call.

Naturally, this entire story is extremely concerning to the Court, especially when faced with the question of Burns's release.  At the very least, it demonstrates an extreme disregard for the authority of the state court and the release conditions

imposed. Further, it indicates Burns's propensity, and ability, to continue trafficking operations, regardless of the conditions imposed by this Court. Of course, Burns contends that she will comply this time, but her past actions make the Court reticent to believe that sentiment. Although Burns does not have an extensive criminal history, her post-arrest actions, when coupled with the seriousness of the original offense, make the Court all too aware of Burns's potential for dangerousness. *United States v. Bland*, No. CR PWG-15-141, 2020 WL 1904742, at *3 (D. Md. Apr. 16, 2020) (concluding that "given the sheer quantity of narcotics Defendant has shown that he is capable of obtaining and distributing, Defendant poses a significant danger to the safety of the community"). Accordingly, the Court concludes that this factor favors detention.

### 4. The Nature and Seriousness of Danger Posed by Release

For the fourth and final factor under the BRA, the Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). In cases involving drug trafficking, courts have repeatedly recognized the grave threat such conduct poses to the community. *See, e.g.*, *United States v. Flowers*, No. 3:05-CR-72, 2005 WL 1981364, at *4 (E.D. Tenn. Aug. 17, 2005) (noting that the "sale of drugs [ ] establish[es] a significant danger"); *United States v. Pina-Aboite*, 97 F. App'x 832, 836 (10th Cir. 2004) ("[T]he danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community[.]").

Here, Burns presents an interesting situation. She has no history of violence. Nor does she have a history of drug-related activities. What she does have, however, is a year-and-a-half long period replete with instances of serious drug trafficking, with some of this activity occurring while on bond in the related state case. Burns's actions demonstrate a belief that she can continue criminal activity without being caught, complete disregard for court-imposed conditions, and an elevated risk that, if released, Burns will continue criminal acts related to the instant offense. The risk to the community posed by continued drug trafficking is substantial. And it cannot be ignored.

On balance, the BRA factors overwhelmingly support a finding that Burns presents a substantial danger to the community and strongly favors detention. Indeed, there are some concerns that can be addressed with conditions. For instance, the concerns generated by Burns's substance abuse disorder can be mitigated through in-patient or out-patient treatment programs or consistent drug testing. However, the most alarming concerns cannot be addressed with conditions. Although the idea of Burns residing with her adoptive parents and thus being constantly under their supervision is persuasive, it does not fully alleviate the Court's concerns. This is especially true when the Court considers Burns's alleged post-arrest drug-trafficking activity. In essence, such behavior effectively torpedoes any trusting relationship built with the Court, and neither Burns, nor court-imposed conditions, can overcome such a hurdle. In sum, Burns's past noncompliance with court-imposed conditions requires the conclusion that no condition or combination of conditions will reasonably

ensure the safety of the community and danger-based detention is required under the BRA.

### D. BURNS'S RISK OF NONAPPEARANCE

Although Burns rebutted the presumption, it remains a pro-detention consideration in both the nonappearance and danger contexts. *Stone*, 608 F.3d 945. Collectively, the history and characteristics of Burns, the nature and circumstances of the instant offense, and the weight of the risk of nonappearance evidence drive the detention analysis.[3]

To begin, the Court must again consider Burns's history and characteristics. 18 U.S.C. § 3142(g)(3)(A) (considering the defendant's employment, history relating to drug or alcohol abuse, criminal history, past conduct, and record concerning appearance at proceedings). As discussed above, Burns has a history of substance abuse disorder and mental health-related issues, including suicidal ideation and self-harm, the seriousness of which has necessitated multiple occasions of in-patient treatment. The extent of these facts suggests a nonappearance risk. *See U.S. v. Valentin-Cintron*, 656 F. Supp. 2d 292, 296 (D.P.R. 2009) ("As a frequent drug user defendant constitutes a 'flight risk.'"); *United States v. Krueger*, 2013 WL 8584873, at *2 (E.D. Mich. July 10, 2013) (explaining that the BRA allows the Court to consider a defendant's suicidal ideations or tendencies in the context of assessing nonappearance). Additionally, there are some questions regarding whether Burns will be able to return to her previous employment opportunity at Dunkin Donuts if

---

[3] The § 3142(g)(4) considerations do not bear on the nonappearance risk in this case. The Court considers that factor briefly in relation to its danger analysis, *supra*.

released. *See United States v. Stidham*, No. 3:10-CR-79, 2010 WL 2639925, at *3 (E.D. Tenn. June 25, 2010) (finding that a defendant's unemployment favors detention).

To her credit, Burns has a limited criminal history and has always appeared as directed in those cases. Although she was reportedly involved in a police chase in 2022, Burns successfully completed electronic monitoring at her mother's house and continued to appear for all related court appointments. Additionally, Burns has a very strong family, who are very supportive and willing to help in any way that she needs. Finally, Burns's possible pregnancy implies a need for long-term medical care, which favors release. Taken together, this factor fully favors release.

The nature and circumstances of the charges in this case indicate some foundational nonappearance risk. *See United States v. Downsbrough*, No. 3:13-CR-61, 2013 WL 2447858, at *1 (E.D. Tenn. June 5, 2013) (noting that Congress has attached a presumption to those types of crimes, such as drug trafficking, which indicate a "strong probability" that the perpetrator will flee (citing *Stone*, 608 F.3d at 947 n.6)). Furthermore, Burns's possible prison sentence, a mandatory 10 years to life, is certainly long enough to encourage nonappearance on some level. *See United States v. Tawfik*, No. 17-CR-20183-2, 2017 WL 1457494, at *6 (E.D. Mich. Apr. 25, 2017) (considering mandatory prison sentences of 15 years to life as a factor that "weighs heavily in favor of detention"). On balance, this factor weighs in favor of detention.

As with the danger analysis, the weight of the evidence of nonappearance similarly encapsulates the above analyses of Burns's history and characteristics and the nature and circumstances of the offense. 18 U.S.C §§ 3142(g)(2)–(3); *see also United States v. Sykes*, 453 F. Supp. 3d 1011, 1015–16 (E.D. Mich. Apr. 13, 2020) (citing *Stone*, 608 F.3d at 948) (noting that, in this Circuit, the § 3142(g)(2) factor looks only to the weight of the evidence that the defendant is a flight risk or a danger); *accord United States v. Sanders*, 466 F. Supp. 3d 779, 785 (E.D. Mich. 2020). In essence, the Court must consider the facts of the crime alleged as well as evidence that the defendant has had flight or nonappearance issues in the past. In short, Burns's history contains only one possible occurrence of flight, and no failures to appear, despite several opportunities for both. Further, Burns was driving the car at the time she was arrested in the state case and demonstrated no cognizable evidence of flight. All things considered, this factor favors release.

Thus, there is not substantial evidence that Burns poses a nonappearance risk, and the BRA factors favor release in this case. Furthermore, the Court is confident that it could craft sufficient conditions to address Burns's substance abuse disorder and any potential mental health issues. The Court's primary concern in evaluating release conditions are the concerns raised by the United States Probation Office ("USPO") regarding the feasibility of implementing those conditions at Leslie Burns's residence. For instance, Mrs. Burns indicated some concern about the ability of electronic monitoring devices to connect to the necessary networks due to the rural location of her home. Counsel for Burns, however, reminded the Court that Burns

was previously on electronic monitoring at her mother's home without any apparent issue. Consequently, if Burns is released, the Court is confident that USPO is capable of finding some alternative solution to the potential problem.

Accordingly, the Court finds that the government has failed to show by a preponderance of the evidence that no conditions can reasonably assure that Burns would appear in this case. Under the BRA, detention is inappropriate on this basis.

## II.   CONCLUSION

For the above-stated reasons, the Court finds that Burns has rebutted the presumption as to both the nonappearance and danger risk. However, the Court finds the United States failed to prove by a preponderance of the evidence that Burns poses a risk of nonappearance but proved by clear and convincing evidence that Burns is an irremediable danger to the community. Detention is therefore required.

The Court has assessed the record, contemplated the risks, evaluated conditions, and determined that no conditions exist that can reasonably assure that Burns will not pose a danger to another or the community. Accordingly, the Court **GRANTS** the United States' oral motion for detention and **DETAINS** Defendant Burns.

Signed this the 9th of February, 2026.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY